John L. McCARTY and Joseph D. Birkmeyer, Appellants,

v.

Harry M. RUNKLE, Appellee.

No. 18226.

United States Court of Appeals
Fifth Circuit.

Dec. 19, 1960.

Robert N. Carnahan, E. Byron Single-ton, A. J. Folley, George S. McCarthy, Amarillo, Tex., McCarthy, Carnahan & Haynes, Amarillo, Tex., for appellant Birkmeyer.

Wayne P. Sturdevant, Amarillo, Tex., Simpson, Adkins, Fullingim & Hankins, Amarillo, Tex., of counsel, for appellant McCarty.

John Lee Smith, Mark Smith, Lubbock, Tex., Mark Smith, Lubbock, Tex., Smith & Smith, Lubbock, Tex., of counsel, for appellee.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal by the defendants from an adverse judgment in a suit for damages for alleged fraudulent representations resulting in a transfer of the plaintiff's property.

The Texas statute which was the basis of appellee Runkle's suit deals expressly with actionable fraud with regard to transactions in stock in corporations:

"Actionable fraud in this State with regard to transactions in real estate or in stock in corporations or joint stock companies shall consist of either a false representation of a past or existing material fact, * *. All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented or as it would have been worth had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract. All persons making the false representations or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in actual damages, and in addition thereto, all persons wilfully making such false representations or promises or knowingly taking the advantage of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered. Acts 1919, p. 77." Article 4004, Vernon's Annotated Civil Statutes of Texas.

In a non-jury trial the court made many findings of fact without, however, expressly stating them to be such. The court's findings present the following picture:

On the suggestion of one Bice, an agent dealing apparently by consent for both parties, Runkle was put in touch with McCarty as a person who might be willing to trade stock in the Estate Life Insurance Company and its associate, Estate Development Company, to Runkle for the 4,000-acre ranch owned by the latter in Arkansas. This ranch, known as Runmoor, was owned by Runmoor Properties, Inc. In his initial contact Bice submitted literature relating to the two Estate companies to Runkle. There-

after McCarty wrote Runkle a letter enclosing a financial statement of the life insurance company.[1] Runkle then visited McCarty and Birkmeyer at the offices of the insurance company in Amarillo, Texas. McCarty was president of the company and Birkmeyer was a director and was represented by McCarty to have been a large stockholder and a person skilled in actuarial matters. At this meeting McCarty and Birkmeyer outlined the nature of the Estate Life Insurance Company and of the Estate Development Company, basing their comments on the financial statements previously sent to Runkle. Included in Runkle's testimony was the following:

"Well, Mr. McCarty outlined the nature of his company, using that historical background that he had sent to me, as the basis of his representations.

"He outlined in a very impressive way the nature of the two companies, made them out to be, to me, and to all of us sitting there, very very fine investments and companies in this part of the country.

"He was a Mason and I was quite impressed with the fact of his representation being made behind the badge (indicating lapel) that he wore, and he very manifestly—and Mr. Birkmeyer, were impressive looking people to me.

"The conversation, in introducing Mr. Birkmeyer, was entirely to the effect that Mr. Birkmeyer had been one of the principal organizers of this company with Mr. McCarty and some of the others. And Mr. Birkmeyer, himself, and Mr. McCarty, represented themselves as being actuarial people with knowledge of the

actuarial history of the company and all of its doings on down to that date. And they undertook to make it very plain to me that notwithstanding what I knew about business actuarial matters, that insurance actuarial matters were rather on a special basis. And Mr. McCarty had asked Mr. Birkmeyer to come into the picture, who was an expert on the actuarial knowledge of insurance corporate matters.

"They went very much into detail about their whole thing. I would ask for statements; I manifestly asked immediately to see what their statement looked like at that time. They could only produce what their printed statement had been to the public and which had been already sent to me. I asked for more than that. But they gave me to understand that they were in process of taking in another insurance company (I think it was called the Physicians Life Insurance, or some such company); and that their records and the State of Texas were subject— being subject to going over at that time so that a consolidated statement was in process of preparation and could not be submitted to me at the time because they didn't know exactly what it was themselves. But they made it very plain that this Physicians Life Insurance Company was a tremendously wonderful thing for their Estate Life Insurance Company and made what they thought was a very fine life insurance company, even much more wonderful, alive, and with a tremendously more valuable background and history and potential history than they had be-

1.           [September 17, 1957]

"Dear Mr. Runkle:

"At the request of Mr. H. J. Bice I am sending you herewith a financial statement, a history of our life company and other background material in connection with your possible interest in our company. The statement as of January 1 is for comparison purposes only and does not give a clear idea of our

present status. Since this time we have added the business of Physicians Life and Accident Company and have increased our reserves to take care of it.

"I would like very much to invite you to Amarillo to look over our property. We need the cooperation of men of your type to realize our fullest potentialities. Is it possible for you to visit us?"

fore they took this Physicians Company in.

"They were delighted with the Physicians' deal and made it very plain that the acquisition of this Physicians deal which brought in other agency offices and other things was a proposition that was very very valuable to their company. I believed and—believed everything they said.

"I don't remember other details in that except that I sat there quite impressed with these gentlemen. They were not five-and-ten-centers; they were business men; and I very manifestly, quickly concluded that they were men of import; I believed them.

"At the conclusion of their relations, or of this business, I asked them where I should go, if at all, to follow up and investigate this matter and Mr. McCarty was immediately offended.

"Q. You mean ·by that you inquired what State office to go to, to make an investigation? A. I asked them where I could go or whether I should go to any particular State office, either the Insurance Commission or some other *picture*, to find information about this thing, to confirm what they were telling me. And Mr. McCarty was offended.

"I said to him that there had been, to my knowledge, reading the newspaper, a group of other small insurance companies here in Texas that had gone through some rather difficult times and the State had to do something with them—I didn't know what. And I didn't want this proposition, if I was ·interested, to blow up in my face, if I went along with them.

"Mr. McCarty made it very plain to me that he was offended, that they were not that kind of people, that they were worthy of my belief, or rather, worthy of my consideration, as honest people; that he was bring-

ing up his son to be .his successor and carry on the business; that on his board of directors was a group of the finest leading businessmen in this section of the country and that I could contact any one of them, and so on, which I didn't do; but they were, I developed, a leading group of businessmen—

\*   \*   \*   \*   \*   \*

"And Mr. McCarty sold me on the proposition that in politics in a general business way here in this community, that he was a leader to be trusted and that I—he was offended that I should undertake to put him in a class with the officials of some other insurance companies that had blown up. He gave me to understand that I could have complete confidence in him and his associates and his integrity and the men who were on his board, and so on.

"And I might say that he sold me on that. His presence, his manner. And he would call on Mr. Birkmeyer from time to time to relate, from an actuarial standpoint, different phases of the company. And they both gave me to understand that the reserves and other things connected with the company were in excellent shape with the Commission and with the State of Texas, and that there ·was nothing that if I went to the Commission or any member of the official insurance group that would be disclosed to me different than they were outlining to me there; there was no use, they said, to go further than us; 'You can rely on our truthful statement to you here.' "

In point of fact the company was totally insolvent at the time these statements were made. Testimony of the company comptroller was to the effect that the insurance company's capital was 100% depleted; the assets included one uncollectable check for $233,000 as cash; a State insurance office auditor testified that there was a deficit in the capital account of $936,000, whereas in the statement furnished to Runkle capital and

surplus were shown to be $900,000, a difference of $1,836,000. It is also shown that the volume of insurance written was grossly overstated and at the time the trade was made the Life Company was unable to meet the weekly payrolls. Both McCarty and Birkmeyer were shown to have had knowledge of the insolvent condition prior to the final trade with Runkle. At the meeting a proposition was made to Runkle that McCarty would exchange 50,000 shares of Estate Life stock and 50,000 shares of Estate Development stock in return for the Runmoor property, which was valued by Runkle at $500,000. No final agreement was made, but Runkle returned home to Ohio and the next he heard was from Birkmeyer who was at the ranch inspecting it. Birkmeyer said he thought the ranch was overpriced at $500,000, and upon his representation that the Insurance Company stock was worth $4.00 a share and had a high growth potential, Runkle agreed to let him have the ranch for 100,000 shares of the Estate Life Insurance Company stock. The stock was transferred from McCarty to Runkle and the Runmoor stock was transferred to Birkmeyer, and Birkmeyer cancelled a note he held of McCarty's for $370,000. Birkmeyer promptly disposed of the ranch to third parties.

The only testimony of value of the Runmoor stock was that of an experienced real estate appraiser who stated that in his opinion the lands and improvements owned by the company were worth $388,000. There was some testimony that Runkle had offered a part of the ranch, two years earlier, at $150,000. The trial court considered this valuation evidence and measured Runkle's damages at $300,000, for which it entered a judgment for Runkle.

Both McCarty and Birkmeyer appeal. McCarty's principal contention is that the sale finally made was negotiated by Birkmeyer and was a different trade from that which he had started and in connection with which he made the representations. Moreover, he contends that Runkle made an independent investigation of the worth of the stock, and thus did not rely on the representation. Birkmeyer claims he was not responsible for the representations made by McCarty and that in a letter he wrote to Runkle before the deal was closed he had put the latter on notice that the company's finances were not as they had been represented to be; thus he says Runkle could not rely on the earlier representations.

■ Dealing with these contentions in order, we think it was reasonably inferable from the evidence, including the joint discussion and representations of the condition of the company, found to be materially false, made by both McCarty and Birkmeyer and including the fact that Birkmeyer finally concluded a sale of stock which belonged to McCarty and as a result of which Birkmeyer and McCarty both received benefits from the transaction, that the parties were jointly liable to Runkle under Article 4004 of the Texas Revised Statutes. See Burton v. Roberson, 139 Tex. 562, 164 S.W.2d 524, 143 A.L.R. 1, and Crofford v. Bowden, Tex.Civ.App., 311 S.W.2d 954, e.r.

The issue of reliance is one of fact. Runkle repeatedly testified that he believed and relied on the false statements. Moreover, he was dissuaded by McCarty from seeking information from other sources. There is nothing in either McCarty's or Birkmeyer's claim that Birkmeyer's letter prior to the closing deprived Runkle of the right to rely on the false statements. This letter contained the following statement:

> "From a normal point of view the condition of Estate Life is rather satisfactory especially comparatively with other companies. However, Mr. McCarty and I are far from satisfied. In fact we feel the condition is 'critical' but not from the view of failure. But rather from our good fortune and success in the production of business has created a problem rather difficult for us to face."

Following receipt of this letter Runkle called on Birkmeyer and asked him what

he meant by the word "critical." His statement as to Birkmeyer's explanation of what he meant was contained in a letter which he wrote to his own accountant, of which he sent a copy to Birkmeyer. The latter acknowledged receipt of the statement and the court could find this amounted to his ratification of what was said in it. This statement included the following:

"Mr. Birkmeyer explained that his use of the word 'critical' in a recent letter to me—was not intended to mean that the company was in any 'critical' condition of possible failure. He explained that the company had sold so much insurance as its present capital structure can handle; that the situation that is 'critical' is whether to write any more at this time—unless they increase their paid in capital and surplus account—to cover the first year deficit premium charge which attaches to newly written business—during that first year. However, he claims that a recent conference between himself, Mr. McCarty (President of the Company), and the auditor—it was felt that the condition would correct itself during the early part of 1958—on account of an increased income from the premiums which the company is not now experiencing.

"It appears that approximately $17,000,000.00 is on the books—and approximately $3,000,000 sold—and in the process of being placed on the books. As long as the company maintains a paid-in capital and reserve account of $250,000 it is entitled—as an unlimited liability company—to write any amount of insurance as its capital structure can finance—to bring it below $250,000.

"Both Birkmeyer and McCarty consider the company to be in good shape—but desire its enlargement to be able to write more business— which costs 1.50% of premium cost during the first year. They want to write more business but cannot unless their capital and surplus account is increased—to cover the first year charge."

In view of the fact that both defendants knew at the time this letter was written that the capital and surplus had been totally wiped out and that the company was not receiving sufficient premium payments and other income to meet its weekly payrolls and that the amount of insurance both sold and on the books was less than half of that stated in the letter, it seems clear that this statement, when approved by Birkmeyer, was of itself a repetition of several of the false representations previously made, rather than notice that they were not to be relied upon.

■ There was ample basis for the trial court's finding that Runkle relied on the false representations. See Smith v. Bifano, Tex.Civ.App., 330 S.W.2d 473, and Crofford v. Bowden, supra.

■ Finally, both appellants complain that Runkle really unloaded worthless property on them and that he is, therefore, not entitled to recover any damages, much less such a substantial ·sum as $300,000. The weakness of this contention is that value is, of course, typically a fact question. Defendants did not undertake to produce expert opinion evidence as to value. They rely only on certain offers made on earlier occasions of less than the whole property. The trial judge plainly had some misgivings as to the opinion value of the Arkansas ranch, but he resolved the problem the best he could by giving due consideration to all the relevant testimony. His figure of $300,-000 cannot be set aside as clearly erroneous.

Although at first contending that the trial court used the wrong measure of damages under Article 4004, appellee filed no cross appeal on this point and in oral argument waived the claim.

The judgment is affirmed.